C. C. CROW v. THE STATE.

No. 22580. Delivered November 17, 1943.
Appeal Reinstated March 22, 1944.
Rehearing Denied May 24, 1944.

The opinion states the case.

*H. S. Beard,* of Waco, and *J. T. Adams,* of Orange, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

The record shows that appellant entered into recognizance on February 26, 1943, which was conditioned that he "shall well and truly make his personal appearance before the Honorable District Court of Orange County * * * and remain in attendance on said court from day to day and term to term of said court until discharged according to law, etc."

This is not sufficient to support the appeal and to give this court jurisdiction.

The appeal is dismissed.

### ON REINSTATEMENT OF APPEAL.

HAWKINS, Presiding Judge.

Conviction is for murder, punishment being two years in the penitentiary. At a former day of the term on, to-wit: November 17, 1943, the appeal was dismissed because of a defective recognizance. Appellant has entered into a proper appeal bond. The appeal is reinstated and the case will now be considered on its merits.

Appellant killed Oscar Snyder. The latter lived in Louisiana. On Sunday, October 13, 1940, he and a friend (McCloud) came across the Sabine River into Newton County, Texas, to hunt squirrels. They agreed to meet at their boat at nine o'clock. McCloud was there, but Snyder failed to return. McCloud thought Snyder was lost; heard several shots while waiting for him, and then made a trip through the woods looking for him. Failing to find him McCloud returned to the Louisiana side of the river, and reported the disappearance of Snyder to his aunt who lived near the river. She and her husband found Snyder about seven o'clock Sunday night. He had been shot in the back of the head and was unable to get up when they found him. Appellant was a game warden and had been assigned to enforce the game laws in the vicinity where deceased was hunting. Appellant's version of the tragedy is substantially as follows. He had been informed that the game laws were being violated and on the Sunday morning in question had gone to the camp house of Fred Hudgens. Appellant asked Fred Hudgens and others to go with him to see if any violations of the game laws were occurring. The party separated after a time, appellant and Fred Hudgens going together. They heard shooting in the woods and went towards it. As they got nearer to the shooting they separated. Appellant finally saw a man, who

turned out to be Snyder, hunting. He was walking through the woods looking up in trees and had some squirrels tied to his belt. Appellant endeavored to get closer to the hunter, who, upon seeing appellant, started to run. Appellant shouted to him to stop, telling him that he (appellant) was a game warden. Appellant ran after him some twenty-five yards and then fired his pistol in the air, thinking that would cause the hunter to stop. The hunter turned and fired at appellant, who felt the shot sting his arm. Appellant then shot at the hunter who immediately fell. The distance was so far appellant did not think he had hit the man, but that he had feigned injury to get appellant to come in closer range. Appellant stepped behind a tree, keeping the man on the ground covered with a pistol. Hudgens testified that he was near enough to hear someone shout, but could not understand the words; that in a few seconds he heard a shot from a pistol or rifle, followed by one from a shot gun, then another from a pistol or rifle; that he went immediately towards the shooting and soon saw appellant standing behind a tree with his pistol pointing towards something. Appellant said, "He shot me Fred; watch him; he is on the ground, I have got him covered." Hudgens pulled the shot gun from under Snyder's body at appellant's direction, unloaded it and picked up an empty shot gun shell from the ground. Appellant told Snyder to get up, apparently still thinking he was not hurt. Getting no response appellant felt of Snyder, saw the wound on his head, and told Hudgens that Snyder was dead. Appellant and Hudgens went back to the latter's camp where the blood was washed from appellant's arm where two No. 6 shot had entered, "monkey blood" put on the wounds and then appellant and others went to Newton to report to the sheriff and have a coroner go to hold an inquest over, as they thought, a dead body. The sheriff was not at home. He was finally reached, and he with others found their way to Snyder's body where his aunt and uncle already were. Appellant did not return with the sheriff to the place of the shooting, but went on to Jasper to have his arm looked after. Finding Snyder alive, the sheriff suggested that they take him to the hospital at Newton for attention, but his relatives preferred that he be taken to the hospital in De Quincy, Louisiana, which was done.

At the instance of appellant the venue was changed from Newton County to Orange County. When the case was called for the present trial appellant sought to quash the indictment because one of the grand jurors who returned same had not paid his poll tax. The record shows that the said grand juror was subject to pay the poll tax and had not done so. The court

overruled the motion to quash, and in qualifying the bill complaining of this action the court says: "The record will show that the defendant was under bond, having had a complaint filed against him in the Justice Court of Newton County, Texas, at Newton, Texas, at the time that the grand jury was empaneled, and no motion to quash the grand jury panel, or any exception to any member of the grand jury was taken."

The record shows that the indictment was returned into the District Court of Newton County on March 11, 1941. On August 25, 1941, appellant filed his motion for a change of venue, and later filed an amended motion upon which the court granted a change of venue on August 30, 1941. When the case was first called for trial in Orange County appellant filed an application for continuance on June 2, 1942, which was granted the same day. The case was then again called for trial on February 15, 1943, and appellant sought a second continuance which was denied. Upon the same day appellant for the first time sought to attack the indictment. Appellant apparently recognizes that the holding in Tyson v. State, Tex. Cr. App., 171 S. W. (2d) 496, and cases therein cited are against him on the delayed attack upon the indictment, and that it should have been made at the first opportunity or will be considered waived. He seeks to avoid this on the ground that prior to the opinion in Conklin v. State, 144 Tex. Cr. R. 210, 162 S. W. (2d) 416, this court had held that a grand jury could not be attacked for lack of payment of poll tax by some of its members, and that until the Conklin case overruled prior cases so holding appellant should not be held negligent in not raising the question until the Conklin opinion was released, and that he did raise the question at the first opportunity after the Conklin case changed construction of the statute.

We might dispose of the point by calling attention to the fact that the opinion in Conklin's case was released on May 27, 1942, and that appellant's first application for continuance was sought and obtained after that date, on June 2, 1942. However, we advert to that contention which in effect is that when by judicial decision a construction of a statute is changed from that formerly given said statute the change by the latter decision should be given prospective effect only. Those caring to pursue the subject at any length will find much to interest them in the notes of various cases on the question in 85 A. L. R., p. 262, notes under report of Great Northern Railway Co. v. Sunburst Oil & Refining Co. Also see 14 Am. Jur. p. 345, Sec. 130, and 7 R. C. L., p. 1000, Secs. 29, 30 and 31. So far as our own state

is concerned the question appears to have been quite definitely settled against appellant's contention in an opinion by Judge Brown of our Supreme Court in Storrie v. Cortez and wife, 90 Tex. Rep. 283.

Bill of exception number one presents a serious question. Dr. Bishop was the physician who attended Snyder after he was taken to the hospital at DeQuincy, Louisiana. The doctor testified at the examining trial of appellant, but was in North Africa with the U. S. Army at the time of the present trial. After laying a proper predicate the State reproduced the evidence of the doctor given at the examining trial. Appellant interposed no objection generally to this testimony, but did object to the reproduction of the evidence as to certain statements which Snyder made to the doctor, the objection being that no sufficient predicate had been laid by the State to admit the statements as a dying declaration of Snyder, and was, therefore, hearsay.

By the provision of Art. 725 Sec. 1, C. C. P., one of the indispensable requisites to the admission of, the statement of deceased as a dying declaration is that the predicate for its admission must show "That at the time of making such declaration he (deceased) was conscious of approaching death, and believed there was no hope of recovery." The evidence shows that when Snyder reached the hospital at about ten o'clock Sunday night he was unconscious and suffering from severe shock. He became rational within an hour or two after he entered the hospital and remained rational until about noon on Tuesday. Dr. Bishop's reproduced evidence is that "All Sunday night, all day Monday, and all Monday evening, I don't believe he (Snyder) thought he was going to die, but from Monday night until Tuesday morning, until he lost consciousness, he seemed to realize he was going to die." Mr. Snyder's wife testified that on Tuesday morning he asked her to pray with him, and detailed circumstances which showed that at such time her husband believed he was going to die. The statement of deceased to the doctor as reproduced was "and this boy (deceased Oscar Snyder) told me he was walking the woods hunting and had a stroke. He told me he was not able to move, and thought about hogs coming up and couldn't move, then thought about flies getting on him. He told me he was walking and hunting in the woods and had a stroke." To have rendered these statements admissible as a dying declaration they must have been made after deceased became conscious of approaching death, that is, sometime between Monday night and noon Tuesday when he lapsed into unconsciousness. If made before that time they

would not be admissible. Of course, they were made at sometime after Snyder reached the hospital, but if made Sunday night after he became rational or any time Monday before he realized that he was going to die they would not come within the realm of dying declarations. We have searched the doctor's evidence as reproduced, as well as other evidence in the record, and have failed to discover any predicate which shows that the statement objected to was made to the doctor after deceased realized that he was going to die. We are, therefore, driven to the conclusion that appellant's objection should have been sustained.

We think it can not be held that the admission of the statements was harmless. The doctor's reproduced evidence is to the effect that it was possible for deceased to have received the wound in the head from a gun shot without hearing the report of the gun, therefore, attributing his condition of paralysis to a stroke. Appellant's version of the tragedy was contrary to the conclusion indicated by the statement of deceased. Appellant claimed that deceased fired at appellant. It appears unquestioned that appellant had two shot wounds in his arm, the shot had not been removed, and were still in his arm at the time of the trial. The statement of deceased would indicate that he received his injury without even knowing of the presence of appellant at the scene of the tragedy.

For the error in admitting in evidence the statements discussed the judgment is reversed and the cause remanded.

### ON STATE'S MOTION FOR REHEARING.

BEAUCHAMP, Judge.

The State has filed a motion for rehearing, in which contention is made that the evidence of Dr. Bishop should be held to be admissible in view of the excluded evidence of two witnesses whose evidence should have been admitted, and when done would show that the deceased contemplated death at the time he was talking with Dr. Bishop. We could hardly give effect to testimony which was excluded and, even if it were submitted, we are confronted with the positive statement of Dr. Bishop who appears to have taken a different view. It will not be necessary to discuss the complication which such excluded testimony might bring about, if admitted. However, the authorities on the subject are clear. In case of conflict, the jury would be called upon to decide a question of fact, upon which finding they would also determine the admissibility of the evidence of Dr. Bishop.

The State's motion for rehearing is overruled.